THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JUAN MARI RAMOS ET AL., Defendants and Appellants; SAME, Plaintiff and Appellee, *v.* JUAN MARI RAMOS, Defendant and Appellant. (TWO CASES); SAME, Plaintiff and Appellee, *v.* JUAN MARI RAMOS ET AL., Defendants and Appellants.

Nos. 15655–658. Argued December 3, 1954.—Decided December 11, 1956.

*Amador Ramírez Silva* for appellants. *J. B. Fernández Badillo, Acting Attorney General* and *Rafael L. Ydrach Yordán, Fiscal of the Supreme Court,* for appellee.

PER CURIAM.

Juan Mari Ramos was charged by the prosecuting attorney of the Mayagüez Part of the Superior Court of Puerto Rico with four violations [1] of § 1 of Act No. 24 of April 20, 1928 (Sess. Laws, p. 166; 24 L.P.R.A. § 821),[2] consisting in his having for sale coffee adulterated with hull of the grain itself (in 12.4, 6, 7, and 7.6 percent) for the purpose of using it for human consumption. The trial having been

---

[1] Codefendants Roberto Santana and Rafael Padilla also appealed in two of those cases. Santana was sentenced to pay a fine of $25 and Padilla $50.

[2] This section provides:

"It shall be illegal to adulterate or to mix coffee, in the grain, ground, or pulverized, with any other grain or substance with the

held before that court, the defendant was convicted and sentenced to pay a fine of $50 in each case, or, in default thereof, to serve one day in jail for each dollar which he failed to pay, plus costs.

On appeal, besides filing a demurrer for lack of facts to constitute an offense, appellant maintains that the trial court erred (1) in finding him guilty, in contravention of the holding in *People* v. *Frau*, 52 P.R.R. 757; (2) in admitting at the trial the transcript of the testimony presented in the *Frau* case by expert Del Valle Sárraga, and (3) in weighing the evidence.

 As to the demurrer, his contention is that since the informations alleged adulteration with the hull *of the grain itself* and not with any other grain, there is no offense because the hull is not *any other substance* (under which modality we must determine the sufficiency of the informations), but *part of the fruit* of the coffee tree.

We do not agree. Although the hull is part of the fruit, it is not a part of the grain itself and, in this respect, it is a substance extraneous to the grain itself, which is the product offered for sale as ground coffee, after termination of the process of roasting, from which the extract used for human consumption is made. The adulterant, according to the law, may be any grain other than the grain of the coffee, such as, among other substances, the hull which covers the two grains contained in the fruit, and which, in the process of roasting, is separated from the grain and thrown away as unfit for human consumption.

---

intention of selling it, or to offer or have it for sale, and it shall be equally illegal for said coffee, so adulterated or mixed, to be sold, offered or had for sale, or that it be transported or stored for the purpose of using it for human consumption, or to use it for industrial purposes, when intended for the preparation of food for human consumption."

The errors assigned do not warrant separate discussion. The main issue involved is whether the holding of this Court in the *Frau* case, *supra*, should prevail in the decision of these cases. We think not. In that case Frau was charged with adulterating coffee with the hull of the grain itself, which expert Del Valle Sárraga, for the prosecution, testified as being a "slight adulteration" because there had been "something like 7 percent hull in all of the coffee." The expert testified that 12 percent of raw fiber is considered standard in normal coffee, stating as follows:

"In this case the data is on the border line between what constitutes an accidental contamination and an intentional addition. Rather it is within the zone of intentional adulteration, *but this witness does not mean to say that such has been the case.* What I mean to say is that if there has been a contamination there undoubtedly has been considerable negligence or carelessness or perhaps some very serious defect in the procedure itself to cause the appearance of fibre in quantity. . . ." (Italics ours.)

Relying on the fact that the expert, on being questioned whether as a result of the analysis he could say that there had been in this case "an active or intentional adulteration," had answered that he could not state with certainty, this Court concluded that the evidence was insufficient for a trial judge to be convinced beyond reasonable doubt of the guilt of the defendant, and we reversed the judgment of conviction.

Appellant herein invokes the authority of that case to maintain that the convictions are contrary to law, pointing out that in all of the cases prosecuted against him, except one, the adulteration was about 7 percent, which is substantially the same as that imputed in the *Frau* case.

We do not agree. In this case the evidence for the prosecution clearly established that the samples of coffee taken in appellant's business contained *hull*, a determination which was based on a *qualitative* test made on a microscopic analy-

sis for the purpose of identifying the structure of the sediment obtained through the usual procedure described by expert Gadea Picó. The presence of the *hull* having been established, a *quantitative* test was made in order to determine the amount of such adulterant. To that end a determination of the percentage of *raw fiber* found was made, since according to the expert testimony the maximum of raw fiber in the grain of coffee of Puerto Rico is short of 14 percent, the excess of this amount of raw fiber being the factor used in determining the percentage of hull present, since the raw fiber is found in the hull of the grain in about 65 percent.

██ Section 1 of the Act allegedly violated punishes not only those who adulterate or mix coffee in the grain, ground, or pulverized, with any other grain or substance, with the intention of selling it, but also any person who sells, offers, or keeps for sale, or transports or stores coffee thus adulterated for the purpose of using it for human consumption. As to the latter modality, the law does not require that the persons who offer, keep for sale, or transport or store it for the purpose of using it for human consumption, shall have adulterated it. The main point is that coffee be adulterated and sold, offered, or kept for sale for human consumption. *People* v. *Beauchamp*, 40 P.R.R. 196. The purpose of the statute, to safeguard the public health, so requires it.

Appellant in the case at bar was charged with *keeping for sale* adulterated coffee. The fact that he was a coffee roaster and that the coffee was ground and packed in his establishment, does not place him in a better situation than would be any other defendant who has or offers for sale adulterated coffee.

██ Nor do we believe that the judgments rendered were erroneous because of the fact that the Supplies Administration sold to the defendant imported coffee and that on

one occasion, April 7, 1953, sent him a telegram advising that the Mexican coffee should be cleared of straw and other substances before marketing. Of the four violations charged to appellant, two were committed in August and October 1952, and two in January 1953, that is, several months before receiving the notice from the Supplies Administration on the Mexican coffee. The evidence for the defendant shows that he used to purchase an average of 100 hundredweights of Mexican coffee a week, apart from the fact that, as it appears from his own evidence, the advice of the Supplies Administration referred to a specific item of Mexican coffee which contained a great quantity of "straw or parchment," which according to the composition of coffee does not include the hull itself.

The statements of the experts for the prosecution that the "*collor*" coffee contained up to 18 percent of raw fiber does not affect the result in this case, since, as has been noted, the presence of hull as an adulterant was qualitatively established.

The evidence in the record being sufficient to uphold the convictions, and not finding that the lower court committed any of the errors assigned, the judgments will be affirmed.